### MARY C. BARRETT

*v.*

### THE BLOOMFIELD SAVINGS INSTITUTION, WILLIAM H. WHITE, JOSEPH H. DODD et al.

[Submitted February 4th, 1903. Decided March 25th, 1903.
Filed April 6th, 1903.]

1. The managers of a savings institution are trustees of a public franchise granted to and held by them for the benefit of the public, and especially for that part of the public in the immediate neighborhood, as well as for the depositors.

2. The depositors in a savings institution occupy a double relation to the corporation as such. In case of insolvency they are its creditors; in other cases they are in the nature of partners or stockholders; but in all cases they are the *cestuis que trustent* of the managers.

3. The managers of a savings institution occupy the position of holders of a public trust of a benevolent and charitable nature, and it is their duty to preserve and foster with reasonable zeal the object of the trust.

4. The managers of a savings institution have no more right to destroy the entity of the corporation while transferring to themselves its most

Barrett *v.* Bloomfield Savings Institution.

valuable asset—its good will—than an ordinary trustee of property has to purchase the property himself, though paying a fair price for it.

5. The act of April 9th, 1902 (*P. L. of 1902 p. 677 c. 224*), authorizes the managers of a savings institution to dissolve it, if, at a meeting of the managers, "a resolution declaring the dissolution to be advisable be passed by a two-thirds vote of the whole board." *Gen. Stat. pp. 3001, 3002 §§ 8, 11*, providing for the organization of savings institutions, requires the state board to ascertain "whether greater convenience of access to a savings bank will be afforded to any considerable number of depositors; whether the density of the population  *  *  *  affords a reasonable promise of adequate support; whether the responsibility," &c., of the persons named in the certificate is such "as to command the confidence of the community." Section 9 directs the board to issue the certificate if they are satisfied the bank will be of "public benefit." Section 11 directs that, if the board is not satisfied that the establishment of the bank "is expedient and desirable," they shall refuse.—*Held*, that in determining whether dissolution is "advisable," the managers are to consider whether further continuance of the institution would be of "public benefit," and "expedient and desirable," as tested by the needs of a considerable number of depositors, by the density of the population, and by the reasonable promise of adequate support.

6. In determining whether dissolution is "advisable," the managers must not be guided by their own personal pecuniary interests.

7. The mere fact that a trust company has been organized in the same community with a savings institution does not show that the dissolution of the latter is "advisable," the mode of investment adopted by trust companies being more hazardous than that allowed to savings institutions under the restrictions imposed on them by the law, and they, therefore, being less adapted to the needs of persons of moderate means.

8. *P. L. of 1899 p. 455*, authorizing trust companies "to receive money on deposit, to be subject to check or to be repaid in such manner and on such terms and with or without interest, as may be agreed upon by the depositor and the said trust company," does not repeal, by implication, *P. L. of 1876 p. 357*, which declares "that it shall not be lawful for any bank, banking association, firm, stock company, corporation or individual banker to advertise or put forth a sign as a savings bank, either directly or indirectly, or in any way to solicit or receive deposits as a savings bank, except in the case of banks or deposit companies now authorized by law to receive deposits on interest, or banks incorporated under this act."

9. A national bank does not afford to persons of moderate means the same facilities for depositing money as savings institutions.

10. *P. L. of 1876 p. 346* (the Savings Bank act), made applicable by section 52 thereof to institutions already organized, expressly declares that "all vacancies in such board by death, resignation or otherwise, shall be filled by the board of managers," &c., and the unwillingness of the present managers to continue in office is therefore no ground for dissolving the institution.

11. If a national bank attempts to compete with a savings institution, the latter should appeal to the law to prevent the national bank from seeking savings deposits.

12. It does not lie in the mouth of the managers of a savings institution who have themselves formed a trust company, which competes with it for savings deposits, to say that dissolution of the institution is advisable because of competition between it and a newly-organized national bank.

13. The attorney-general is not the only one who is entitled to maintain a bill to prevent the managers of a savings institution from dissolving it, but a depositor therein may, in her *status* as depositor, and also as a citizen of the community, maintain such a bill.

14. The fact that a depositor, in case of dissolution of a savings institution, will receive back his deposit and share in the surplus, cannot prevent him from maintaining a bill to prevent the dissolution.

On order to show cause. Heard on bill and affidavits, and the joint and several answer of the several defendants and affidavits.

*Mr. Halsey M. Barrett,* for the complainant.

*Mr. Robert H. McCarter* and *Mr. Gilbert Collins,* for the defendants.

PITNEY, V. C.

The object of the bill is to restrain an alleged breach of trust. The complainant, Mrs. Barrett, sues in behalf of herself and her four children, as severally depositors in the defendant corporation, the Bloomfield Savings Institution, and charges that the individual defendants, William H. White, Joseph H. Dodd and the others named in the bill, are the president, treasurer and managers thereof, and as such are engaged in carrying through a proceeding which, if consummated, will amount to a breach of trust on their part.

Briefly stated, the allegation is that, in the summer of 1902, the individual defendants, eleven in number, being then officials and managers of the savings institution, comprising all but two of the board, organized themselves, with two additional persons, into a trust company, of which they are the directors, and the defendant White the president, and the defendant Dodd the

treasurer; that they opened a banking office in the room of the defendant corporation, and conducted their business as a trust company over the counter and by the officers of the savings institution; that, in the last days of December, 1902, they, as managers of the savings institution, took proceedings, under the act of April 9th, 1902 (*P. L. of 1902 p. 677 ch. 224*), to wind up the institution and distribute its assets, not including its good will, among its depositors, and took measures to induce all its depositors to transfer their deposits to their trust company, thereby attempting to appropriate to the latter company the benefit of the good will and established reputation of the savings institution.

The defendants justify their conduct under the terms of the act just cited.

The bill was presented and an *interim* restraint granted before the transaction was completed. The question now is whether such restraint shall be continued until the final hearing of the cause.

The question involved in the record is of great importance, and has been argued with much ability by the eminent counsel who appeared for the respective parties. I have given it the best consideration of which I am capable.

I have said that the question is of great importance, not so much to the parties to this cause as to the public at large, and especially to those citizens who believe that the savings bank system of this state, and, indeed, of most of the other states of the union, is of great value to the public at large, in that it tends to promote industry, thrift and contentment among what are known as the laboring classes, to give them a stake in the community, to repress a disposition to be led away by the fallacies of socialism and anarchy, to promote civic virtue, and to produce good citizens. And the importance of the question lies right here: that it is quite certain that if the project of the defendants to convert the Bloomfield Savings Institution into a trust company—for that is what it amounts to—cannot be arrested by legal process, either at the suit of the attorney-general or of some citizen, then it follows that it is within the absolute power of the managers of every savings institution in

this state to wind up their several institutions, divide among the depositors the net value of the assets, not including the good will, and by the simple process of the organization among themselves of a trust company, to be located in the very building and managed by the very same officers as those of the expiring savings institution, appropriate to themselves the good will thereof, amounting in value, in the aggregate, to many millions of dollars, and, at the same time, to practically destroy the whole system.

I will give the result of my consideration by stating at the outset more in detail the facts of the case, and then inquiring—*first,* whether a breach of trust is threatened by the defendants, or is possible under the act; and if that proposition is found in the affirmative, then, *second,* whether the present complainant has any standing in this court to seek to restrain the same, or whether the only party who has such standing is the attorney-general, in behalf of the state.

The Bloomfield Savings Institution was organized under a special act, approved March 21st, 1871 (*P. L. of 1871 p. 647*), by which twenty-nine gentlemen, therein named, residents of Bloomfield, were incorporated and authorized to conduct a savings institution. A recital of its provisions is unnecessary, except to say that they are, in substance, the same as are found in all savings institutions created about that time.

Thus the managers are forbidden to receive any compensation for their services, or to borrow, either directly or indirectly, any money from the institution, or to have any interest whatever in any deposits therein. They are restricted in the securities in which they may invest the funds of the depositors.

It seems to have been well managed. It commenced, as all such institutions must, with small beginnings, and, to use the language of the answer,

"the same by careful attention has developed gradually so that on the first day of January, nineteen hundred and three, it had total deposits amounting to $829,224.63, and a surplus of $67,477.18, and in so far as said figures represent the savings and manifest the thrift of the said depositors, of whom these defendants believe there are about twenty-three hundred, not all of whom reside in the town of Bloomfield, these defendants believe

that the said institution, like any other similar and carefully managed savings bank, has been of advantage to the community. * * * It is also true that within the last six years the deposits in said institution have increased at about the rate of $70,000, and that the surplus has grown from $30,000 to between $60,000 and $70,000, and that said institution has been, and is, prosperous and successful."

A schedule, contained in the answer, stating the annual deposits for ten years, from January 1st, 1894, to January 1st, 1903, inclusive, shows a gradual increase of deposits from $213,000 to $829,000, of which $74,000 accrued during the calendar year of 1902, and $18,500 in the month of December, 1902, and the surplus in six years has grown from $30,000 to nearly $70,000.

In the month of May, 1902, the individual defendants, with two other persons, applied to the banking and insurance department of New Jersey for a charter for a trust company, with the name of the Bloomfield Trust Company, under the "Act concerning trust companies" [Revision 1899] (*P. L. of 1899 p. 450*), and in pursuance thereof, on July 1st, 1902, the Bloomfield Trust Company was incorporated, and on September 10th, 1902, it opened business in the office and banking-house of the Bloomfield Savings Institution, and with the same officers.

And here we come upon the only region of disputed fact.

The bill alleges that, from the beginning of the trust company project, the individual defendants intended to wind up the savings institution and turn its assets and business over to the trust company. This is denied by the defendants. They say that they first thought of winding it up in the latter part of December. I am unable to assume, in the face of the other allegations of the answer and the admitted facts of the case, that the defendants' account of the affair in this respect is absolutely true. I should prefer to hear them cross-examined upon it. I should like to be informed how they expected to conduct two such companies, at the same time, in the same office, and by the same officers.

Taking all the allegations of the answer and the admitted facts, I am unable to accede to the contention of the defendants that the winding up of the savings institution was not in their

minds from almost the start. Be that, however, as it may, on the 31st of December, 1902, a special meeting of the managers of said institution was called, at which all but two of the members of the board were present, and at that meeting the following preamble and resolutions were adopted:

"WHEREAS, a request, in writing, by a majority of the board of managers of the Bloomfield Savings Institution has been heretofore presented to the president, asking that he call a special meeting of the board of managers of this institution for the purpose of considering and passing a resolution declaring the dissolution of this institution to be advisable; and

"WHEREAS, acting upon said request, the president did, on the twenty-seventh of December, nineteen hundred and two, call a special meeting of this board upon at least three days' notice given by mail to every manager, stating the object thereof; and

"WHEREAS, this meeting is attended by more than two-thirds of the board of managers of said institution, to wit, by eleven members out of thirteen; and

"WHEREAS, by reason of the fact that the Bloomfield Trust Company are prepared to offer to savings investors, through their savings department, the facilities and advantages heretofore offered by this institution, and the further security and safeguard of their capital and surplus amounting to $120,000; and

"WHEREAS, said Bloomfield Trust Company have offered to facilitate the liquidation of the affairs of the institution and the payment of its obligations and depositors by purchasing its securities and otherwise;

"*Now, be it resolved*, that this meeting declare the dissolution of this institution to be advisable; and be it further

"*Resolved,* that the president and secretary of this institution be and they are hereby authorized to certify to a copy of this resolution as having been passed in manner provided for by chapter 224 of laws of 1902, and entitled 'An act,' &c. On motion, duly recorded, the officers of this institution were authorized and empowered to demand notice of the withdrawal of deposits at their discretion, subject to the by-laws, from all depositors."

Immediately and pursuant to these resolutions they issued and enclosed in one envelope and sent by mail to each depositor of the savings institution, over two thousand in number, two circulars, as follows:

"BLOOMFIELD, N. J., December 31, 1902.
*"To the Depositors of the Bloomfield Savings Institution:*

"The Bloomfield Trust Company, a strong and reliable banking institution, has offered to take over the entire business of the Bloomfield Savings Institution, to continue it in the same location, and to pay depositors the old rate of interest, viz., 3½ per cent. per annum.

Barrett *v.* Bloomfield Savings Institution.

"Although the Bloomfield Savings Institution is a sound and prosperous concern, yet, in view of the fact that the new institution will offer absolute security to its depositors, with a capital and surplus nearly twice as large as the surplus of the savings bank, the managers, acting according to their best judgment for the interests of all, have resolved to go into voluntary liquidation; thus leaving the field to the new institution and practically accepting their offer.

"A dividend has been declared, as usual, up to January 1, 1903, at the rate of 3½ per cent. per annum. *The surplus will be credited to depositors, pro rata,* as soon as liquidation shall have been completed.

"All of our depositors are requested to continue their accounts with our successors, whom we heartily recommend as being worthy of their confidence. Their circular will be found enclosed herewith.

"By order of the Board of Managers,

"JOSEPH H. DODD, *Secretary.*"

### "BLOOMFIELD TRUST CO.

"NO. 7 BROAD STREET.

"Paid-up Capital and Surplus........................................$120,000

"OFFICERS:

"WILLIAM H. WHITE, *President.*          JOHN SHERMAN, *Vice President.*
"JOSEPH H. DODD, *Secretary and Treasurer.*
"JAMES N. JARVIE, *Chairman of Executive Committee.*
"ROBERT M. BOYD, JR., and EDWARD OAKES, *Counsel.*

"DIRECTORS:

| | | |
|---|---|---|
| "James N. Jarvie, | Allison Dodd, | William W. Snow, |
| "Wm. R. Broughton, | A. R. Brewer, | Edward Oakes, |
| "John M. Van Winkle, | Edwin M. Ward, | Robert M. Boyd, Jr., |
| "John Sherman, | William H. White, | N. Harvey Dodd, |
| | "Joseph H. Dodd. | |

"Referring to the enclosed circular of the Bloomfield Savings Institution. we desire to say that the Bloomfield Trust Company is prepared to purchase the entire assets and assume all the liabilities of the savings bank.

"The savings department of this company will be located in the room the savings bank has occupied, the same tellers will be in attendance and deposits will be received and payments made as usual without interruption. Depositors are assured careful and prudent management, the president, vice president, secretary and nine of the directors of the trust company being of those who have managed the savings bank for many years past. All money now on deposit will draw interest from to-day, and hereafter moneys deposited on or before the third day of any month will draw interest from the first day of said month.

"Bloomfield Trust Company,

"WILLIAM H. WHITE, *President.*

"BLOOMFIELD, N. J., Jan. 1, 1903."

Those circulars reached the complainant on the 2d of January, 1903, indicating that they had already been printed before the resolutions were adopted.

Shortly afterwards the complainant, by her husband as counsel, called upon the managers and remonstrated with them, and asked them to suspend their operations, threatening suit in chancery.

He waited a day or two for their answer, and, learning from them that they conceived that they were justified in their action, he thereupon filed this bill.

It is impossible, in the face of the resolutions and circulars, above set forth, for the defendants to assert, with any hope of success, that their object in the winding up of the savings institution was not to turn over all its deposits and its business to their trust company, and that, by so doing, they would acquire, without paying anything therefor, the good will and established reputation of the institution, which, for over thirty years, had been successfully managed by competent persons, and, as the case shows, enjoyed the confidence of the community.

This brings me to the principal question, and that is: Have the defendants been guilty of any breach of trust? And that leads to an examination of the question, which, however, seems to me really to need no examination, of the real relation which the managers of this and other savings institutions bear to the public and to the depositors.

And I will say at once, before citing the authorities, that I had supposed that if anything was perfectly well settled in New Jersey it was that the managers of a savings institution occupied the position of trustees of the depositors; and I think an examination of the authorities shows that their position is of even a higher grade than that: they are trustees of a public franchise, granted to, and held and exercised by, them for the benefit of the public at large, and especially that part of the public in the immediate neighborhood of the location of the particular institution, as well as for the depositors in their institution.

In this state the leading exposition of the character of the trust is found in the admirable opinion of the late Judge C. S.

28

Green in *Hannon* v. *Williams,* 7 *Stew. Eq. 255.* I think it worth while to quote therefrom:

"In the solution of this question regard must be had to the peculiar character of the corporation itself, and to the mutual relations of the depositors to each other and to the corporation. Savings banks differ widely in their objects, organization and character from ordinary banks and other joint stock companies. They have no capital stock. They are incorporated and organized, not for the advantage of the corporators, but solely for the benefit of the depositors. Their object, as stated in some of the early charters of this state, is to receive and safely invest the savings of mechanics, laborers, servants, minors and others, thus affording to such persons the advantages of security and interest for their money, and in this way ameliorating the condition of the poor and laboring classes by engendering habits of industry and frugality.

"Properly organized and conducted, a savings bank is a *quasi* charitable and purely benevolent institution. Its only object is the safe keeping and provident investment of the funds of the depositors. The members of the corporation have no property interests in its funds, of which they are, by law, constituted the managers and guardians. The depositors, who alone are beneficially interested in the prosperity of the bank, have no voice in its management, nor even in the selection of the persons to whom its management is entrusted.

"The assets of the bank are its invested funds, the common contributions of all the depositors, in which they all have a common interest. All the profits of the business are divided among the depositors or accumulated in a surplus fund for their joint benefit and greater security.

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

"In a savings bank the depositors bear, in great degree, the same relation to each other and to the property of the bank as do the stockholders in other monetary institutions. To the corporation itself they occupy the double relation of stockholders and creditors. In prosperity they are the stockholders among whom the profits are divided. In case of insolvency they are

the creditors, and usually the only creditors, among whom the remaining assets are to be distributed. If the depositors were themselves made by law the corporators, empowered to elect managers from their own number, thus forming a mutual savings bank, the similarity would be more complete, and the natural equity of the depositors in their mutual relations to each other and the corporation more clearly apparent.

"The fact that the law, for the greater security of the depositors and the more provident investment of their funds, has wisely taken the management out of their control and placed it in the hands of disinterested corporators, cannot, in equity, change the relations of the depositors to each other, or affect their mutual interest in the common fund."

Next we have *Chester* v. *Halliard, 9 Stew. Eq. 313.* There several depositors sued the managers alone, in equity, to recover losses occasioned by their misconduct in office, and it was held that the complainants occupied the position, *pro hac vice,* of creditors of the corporation (not of the managers), and could only maintain the suit in the interests of the latter, and that it should be made a party. It was not suggested that, if properly framed and free from multifariousness, the bill would not lie against the managers. The only basis of such a suit was, of course, that the managers were trustees and had been guilty of a breach of trust.

In *Williams* v. *McKay, 13 Stew. Eq. 189,* the relation of trustee and *cestui que trust* between the depositors and managers is declared in the strongest terms. I quote as follows:

"It is a mistake, sure to mislead, to regard this suit as one solely in right of the insolvent corporation. It does not rest upon that narrow footing, for the receiver represents, not only the corporate body, but likewise the depositors and creditors; and the question which presents itself, therefore, is as to the *status* of the managers with reference to the latter two classes of persons; and as to them I entertain no doubt whatever that these officers must respond to them in the character of their trustees. In reaching this conclusion the principle so often stated in the decisions and text-books is in nowise controverted, that a trust, to be exempt from the operation of the statute of

limitations, must be of a nature to stand the triple test, viz., first, it must be a direct trust; second, it must be of a kind belonging exclusively to the jurisdiction of a court of equity, and third, the question must arise between the trustee and the *cestui que trust*. And in each of these respects the present case harmonizes with the standard. If it is a trust at all, it certainly is a direct one, for it arises immediately upon the placing of the funds under the control of this body of officers. Such a transaction has nothing of the nature or qualities of those indirect trusts that require for their creation a decree of a court of chancery, as, for example, where money, under certain circumstances, has been fraudulently secreted, and a decree in equity will ofttimes convert it into a trust. It is admitted, on all sides, that depositors in one of these banks acquire, *ipso facto,* an equitable right, which, by taking a certain course, they can put in force against the directors or managers, if they have sustained a loss by reason of the misfeasance of such officers; and if such a right exists, what is it, if not the right of a *cestui que trust* against his trustee? This right, thus referred to, is, very plainly, not a right inherent in a contract, for a depositor pays his money to the corporation, and makes no bargain with the managers. And yet the law indisputably establishes an equitable right in his favor from the naked fact of his relationship with this class of officers. And it would be singular, indeed, if the law did not raise up a trust out of such a connection. The affair between the depositor and the managers embraces all the materials out of which trusts are created, for I know of no reason why the transactions denominated trusts have been invested by law with their peculiar qualities and characteristics, except that the property that they embrace is put, by way of confidence, under the absolute control of the person called the trustee, and that the person in whose favor it is so placed cannot enforce or protect his interest in a court of law. And this, in all respects, is the situation when a man places his money in one of these banks: the transfer of such money is nominally to the corporation, but with the intent to put it under the unsupervised control of the managers, in whose appointment the depositor takes no part, his sole reliance being in the honesty

and general trustworthiness of such officers, and such an affair, as it admittedly creates an equitable right on the one side, and a correlative obligation on the other, necessarily establishes a direct trust.    It will be also observed that the transaction exhibits the second and third requisites of a trust, inasmuch as the right of the depositor to look to the managers for reparation when a loss has been occasioned by their default is an equitable one, cognizable only in a court of conscience, and the present proceeding is between the trustee and the legal representative of the *cestuis que trustent*."

It was on this principle that the managers were held liable in the Newark Savings Institution case, *Wilkinson* v. *Dodd, 15 Stew. Eq. 647,* and in the Mechanics and Laborers Savings Bank case, *Williams* v. *McKay, supra,* and *1 Dick. Ch. Rep. 25.*

As displaying the peculiar character of the trust, the language of Mr. Justice Strong, speaking for the supreme court of the United States, in *Huntingion* v. *Savings Bank, 96 U. S. 388* (at *pp. 394, 395*), is valuable:

"We think the complainants have mistaken the nature of the corporation.    It is not a commercial partnership, nor is it an artificial being, the members of which have property interests in it, nor is it strictly eleemosynary.    Its purpose is rather to furnish a safe depositary for the money of those members of the community disposed to entrust their property to its keeping. It is somewhat of the nature of such corporations as church wardens, for the conservation of the goods of a parish; the college of surgeons, for the promotion of medical science, or the society of antiquaries, for the advancement of the study of antiquities. *  *  *   It is, like many other savings institutions incorporated in England and in this country during the last sixty years, intended only for provident investment, in which the management and supervision are entirely out of the hands of the parties whose money is at stake, and which are *quasi* benevolent and most useful, because they hold out no encouragement to speculative dealing or commercial trading.    This was the original idea of savings banks.    *  *  *   Indeed, until recently, the primary idea of a savings bank has been that it is an institution in the hands of disinterested persons, the profits of which, after

deducting the necessary expenses of conducting the business, inure wholly to the benefit of the depositors, in dividends or in a reserved surplus for their greater security. Such, very plainly, is the defendant corporation in this case. The complainants have, therefore, no pecuniary interest in it, and no right to the relief they ask."

Again, we find the supreme court of Massachusetts, in a case sent for its opinion by the senate of that state, saying (*9 Cush.* *609*) :

"These institutions are established wholly for public purposes, are entrusted with large amounts of money belonging to persons who can ill afford to lose it, and who are in no condition to be able to judge of, or provide for, its security.

"The officers and managers of these institutions have no private, personal pecuniary interest in them, but conduct them wholly for the benefit of the poorer classes of the community, and therefore laws made for the benefit and security of depositors cannot be objected to by these officers on the ground that any interest of their own is affected. The directors and managers of banks generally are personally interested in them, but the officers of savings banks act wholly for the public and for the poorer and less prosperous classes of the public.

"The usefulness of the institutions of savings must depend on their possessing the public confidence, and the public confidence must very much depend upon their being under the wholesome inspection and control of the government. It is no doubt important, both as respects the public confidence and as regards the safety of their operations, that all these institutions should be subject to one uniform system of regulations, particularly in a matter of so much importance as the mode of investing deposits; and the general laws upon this subject being clearly within the general and rightful power of the legislature, and relating to a matter of great public concernment, must be binding upon the Provident Institution for Savings in Boston, in common with other similar institutions, unless that institution is beyond the power of the legislature in this particular, by force of the provisions in its particular act of incorporation."

And in *Burrill* v. *Savings Bank, 92 Pa. St. 134,* the supreme court of that state says: "Savings banks like the defendant * * * are really charities for the benefit of the poor."

Against this view the learned counsel of the defendants urged what was said by Judge (now chancellor) Magie in the famous case of *Dodd* v. *Una, 13 Stew. Eq. 672* (at *pp. 705,* bottom, *706,* top). But an examination of that case shows that what he said there has no force in the present connection. There the question was whether the court of chancery had jurisdiction to deal with the Newark Savings Institution, in the manner it did, upon a mere petition. If it had such jurisdiction, then it had power to convict Mr. Dodd of contempt. If it had not such jurisdiction, then the court held that it had not such power. The jurisdiction was attempted to be sustained in the learned argument of Mr. Kalisch (at *p. 682*) on the ground that the savings institution was a charitable trust or use, in the strict sense which that word has acquired in English jurisprudence; and that proposition was contested by the other side, and was the proposition about which Chancellor Magie expressed doubt. He had not before him for consideration the question whether the managers of a savings institution, in the management thereof, occupy the position of trustees towards the depositors, or the question whether they occupy a position of public trust exercised for the benefit of the public at large.

The distinction between such a trust and a charitable use, strictly speaking, is quite clear. It has, indeed, been said, and very properly, that the depositors occupy a double relation to the corporation as such (not to the managers)—that in case of insolvency they are creditors of the corporation; that in cases lacking the element of insolvency they are in the nature of partners or stockholders. But in all cases they are the *cestuis que trustent* of the managers, precisely, but in a more marked degree, as the stockholders of an ordinary trading corporation are the *cestuis que trustent* of the directors.

One is liable to fall into confusion of thought and inaccuracy of expression in this connection if one does not keep in mind the clear distinction between the corporate entity and its man-

agers. The relation between the depositors and the corporation may be quite different from that between the managers and the depositors.

Chancellor Magie, in *Dodd* v. *Una, supra,* held (at *p.* 710) that, admitting that the affair assumed the shape of a charitable trust, the court had no jurisdiction.

The result I reach from a consideration of the judicial utterances above quoted, in connection with our scheme of legislation on the subject, is that these defendants occupy a position of the holders of a public trust of a benevolent and charitable nature, similar to that held by the trustees of the hospitals for the insane and of the normal school and the like, which are created and maintained by the state for the benefit as well of the public as of a particular class of persons, citizens of the state, in the operation and result of which the trustees have no personal pecuniary interest, except their stated compensation; that the terms of their trust are laid down with great precision in the statute creating it; that their plain and imperative duty is to preserve, promote and foster, with reasonable zeal, the object of the trust, and to avoid assuming any attitude hostile to or destructive thereof.

They had no more right, by any sort of contrivance, to destroy the entity of the corporation while transferring to themselves its most valuable asset—its good will—than an ordinary trustee of property has to purchase the property himself, though paying a fair price for it.

The destruction of the corporate entity was a breach of trust, and the appropriation to themselves of its good will was another, unless justified by legislation.

What would be said of a conveyance of a part of the shore front of the state by the riparian commissioners to a third party for their own direct or indirect benefit, or of a sale by the managers of a lunatic asylum or of the state normal school to themselves or a third person to their use of a portion of the personal property under their management?

In this connection the cases of *Porter* v. *Woodruff, 9 Stew. Eq. 174,* and *Bassett* v. *Shoemaker, 1 Dick. Ch. Rep. 538,* are instructive.

The defendants assert that they are justified in what they have done by the language of the act of April 9th, 1902. *P. L. of 1902 p. 677.* That act authorizes them to dissolve the institution if, at a meeting of the managers called to consider the question, "a resolution declaring the dissolution of said institution to be *advisable* be passed by a two-thirds vote of the whole board."

The meaning of the word "advisable" is sufficiently clear and simple. That is "advisable" which is expedient, prudent and proper to be done, and therefore proper to be advised to be done. Its synonyms, according to Webster, Worcester and the Century Dictionary, are "expedient," "proper," "desirable," "prudent," "wise," "best."

It seems clear to my mind that in the act here in question the word "advisable" includes those qualities as applied to the continuance of the existence of the defendant corporation in view of the interests of the public generally as well as in the interests of that portion of the public in the immediate neighborhood of Bloomfield.

I am unable to conceive that the legislature intended that the managers, in judging upon and determining such advisability, should take into consideration their own individual interests or that of their friends, or even act from mere indifference, or a desire to be relieved from the duties of their offices. In my judgment the only consideration which the legislature intended should influence their judgment are the interests of the public.

In determining the particular considerations which should influence their judgment in deciding upon the advisability of the dissolution of the institution we may properly look to the savings bank legislation providing for the organization of new institutions. *Gen. Stat. pp. 3001, 3002 §§ 8, 11.*

By section 8 it is provided that the state board, consisting of the governor, secretary of state and comptroller, shall determine as to the propriety of granting an application for the incorporation of a savings bank association, and for that purpose shall ascertain from the best sources of information at their command—

(1) Whether greater convenience of access to a savings bank will be afforded to any considerable number of depositors by opening a savings bank at the place designated in such certificate.

(2) Whether the density of the population in the neighborhood designated for such savings bank, and in the surrounding country, affords a reasonable promise of adequate support to the enterprise.

(3) Whether the responsibility, character and general fitness for the discharge of the duties appertaining to such a trust of the persons named in such certificate are such as to command the confidence of the community in which such savings bank is proposed to be located.

Section 9 provides that if the state board shall be satisfied, from the information so gained on the points just named, "that the organization of a savings bank as proposed will be a *public benefit,* they shall" proceed to issue certificate, &c.

Section 11 provides that if the state board shall not be satisfied that the establishment of a savings bank as proposed "is expedient and desirable," they shall refuse.

It seems to me, from the consideration of these provisions, that the question submitted by the legislature to the judgment of the managers of this institution was whether its further continuance would be a "public benefit" and is "expedient and desirable," as tested by the needs of a considerable number of depositors, and by the density of population in its neighborhood, and the reasonable promise of adequate support for its continuance.

The next question is this: Did the legislature commit that important question of "advisability" to dissolve to the managers, acting as trustees, such as I have described, disinterestedly and semi-judicially, having in view only the interests of the public and the needs of the community; or did the legislature intend that they might act in disregard of the object and purpose of their trust, and be guided in their judgment by their own personal pecuniary interests? If the former, then the legislation relied on cannot aid them.

It is a cardinal rule that all trustees must act disinterestedly— that they can do no act as such with the view of forwarding

their own interests.   Hence authority given to a trustee to do any act, including, of course, the exercise of judgment, is presumed to be given to him in his character of trustee, and subject to the rules governing trustees; and, as above observed, he must in all things act disinterestedly.

This is a rule of universal application, and governs all trustees, however appointed and by whatever name described.   Thus commissioners appointed by a court to divide or, in case of inability, to sell lands; the riparian commissioners, who are empowered to sell lands of the state under tide waters; also administrators empowered by the orphans court to sell lands to pay debts and others of that class are subject to it, as well as trustees under a will or a family settlement.   Each and every of them must in all things act disinterestedly; they cannot be, either directly or indirectly, interested in any sale that they make or in any other act done as such trustees.

It is impossible to escape the conviction, on the case as now presented, that the managers were not acting disinterestedly in resolving that it was advisable to dissolve this institution, and that they were liable to be influenced in their judgment on that question by their individual interests, and hence were guilty of an abuse of the authority given them by the act invoked in their justification.

The whole transaction, therefore, upon well-settled principles, must be held to be, *prima facie,* void or voidable, and therefore subject to review in this court.

If I am right in this conclusion, then the present restraint should be continued until final hearing, to the end that the merits of the question involved may be fully investigated and deliberately considered.

But the defendants, by their answer, attempt to justify their judgment of advisability by stating the grounds of their judgment.   Their position was elaborately argued and received my careful consideration, and I will state my views upon it.

They say they were no longer obliged to keep up the organization of the savings bank, and that it was no longer "advisable" to do so because its continued prosperity was threatened by the competition (1) of a national bank, and (2) by the trust com-

pany which they themselves had organized; and they say there
was no necessity for its continuance, because their trust company
offered an equally safe place of deposit in which their depositors
might place their money.

The language of the answer is:

"That Bloomfield has a population of about eleven thousand, which
has perhaps more than doubled since the organization of said savings
institution. They likewise admit that such population includes many
persons of moderate means, and that there are several factories and
manufacturing establishments located in said town, and that the said
savings institution was organized by public spirited citizens of the town,
for the purpose for which all savings banks are intended to be organized,
the encouragement of thrift and saving on the part of people of moderate
means, and that no banking institution of any kind then existed in
Bloomfield or Montclair. They show, however, that the occasion for the
continuance of said savings institution no longer exists; that two other
solvent and well-managed institutions have in the meantime been organ-
ized and are now in successful operation [referring to the national bank
and the trust company] offering to the same class of persons an equally
advantageous opportunity to deposit their savings."

And again, they say that the purpose and object they had in
dissolving was because they considered it "advisable" in view
of the fact that no longer a necessity seemed to exist therefor,
and because ample opportunity was afforded to the depositors to
enjoy even better privileges in institutions of high standing and
good management.

With regard to their statement that the new trust company
offered equal and better advantages for the class of depositors
known as savings bank depositors, I have to say that therein
they are running counter, not only to the settled convictions
of most of the intelligent and conservative citizens of the state,
but to the clear and settled policy of the state as manifested by
the charter of every savings institution lately granted by it, and
more particularly by the General Savings Bank act. Those
charters, and especially the General Savings Bank act, which
applies, in most of its important features, to those savings insti-
tutions which were already in existence at the time it was passed,
put certain restrictions upon both the officers of the savings insti-
tution and upon their mode of conducting the business. They

absolutely prohibit any savings bank officer or manager from having any pecuniary interest in or deriving any benefit, directly or indirectly, from his bank, except his salary or fees paid him for his services, and which are subject, where not actually restricted by statute, to the approval of the banking department. Then the legislation just mentioned restricts the investment of the moneys of the depositors to a certain class of securities, which are of a character that come, as nearly as practicable, to insuring depositors against any loss. Experience of many years has shown all those who are versed in matters of this kind the value of these restrictions. They are based on the familiar principle that better security can be obtained for money loaned at a low rate of interest than for that loaned at a higher rate, and that the class of persons who patronize savings institutions are best served by a safe investment at a low rate and as nearly as practicable free from hazard.

Those restrictions are not found in the act regulating trust companies, and it is a well-known fact that the mode of investing their moneys and of making gains adopted in this country by trust companies is more hazardous than that allowed to savings banks under the restrictions imposed upon them.

It is unnecessary to particularize the lines of business, indulged in by trust companies, which are hazardous. They are well known to all business men.

The general business of banking is divided into many classes, and some parts of each class of business may be carried on by the same institution, but the particular class of business indulged in by trust companies in this country, and by which they have made their principal gains, is probably well and briefly described by the author of the article on "Banking" in the ninth edition of the *Encyclopedia Britannica,* page 328, under the head of "Credit Companies," thus:

"*Credit Companies,* such as the *Crédit Foncier,* the *Crédit Mobilier,* etc., etc., are strictly analogous to land mortgage banks, except that they invest their funds in loans on the security of *general industrial undertakings,* to which business they have added the function of negotiators of direct loans between companies formed for the conduct of such undertakings and the capitalist public."

In doing this the modern trust company frequently invests its own and its depositors' money in large blocks of fresh issues of corporate securities, based upon all sorts of modern enterprises, while as yet in their experimental stages, at what are supposed to be low prices, in the expectation of being able to sell them at an advance. This, I believe, is called "financing" a new enterprise.

In marked contrast with this class of investments is that to which savings banks are by statute confined.

. They are first mortgage loans upon improved real estate to the extent of not more than one-half its carefully appraised value.

Besides these they may invest as follows: In the stocks or bonds or interest-bearing notes or obligations of the United States, or those for which the faith of the United States is distinctly pledged; in the interest-bearing bonds of this state; in the bonds of any state in the Union that has not within ten years previously defaulted in the payment of any part of either principal or interest in any debt authorized by any legislature of such state to be contracted; in the stocks or bonds of any city, town, county or village of this state, issued pursuant to the authority of any law of this state; or of the cities of New York, Brooklyn or Philadelphia; or in any interest-bearing obligations (other than those commonly known as improvement certificates) issued by the city, town or borough in which such bank or institution shall be situated; in the bonds of any city or county of any state of the United States of America, which have been or may be issued pursuant to the authority of any law of any such state; provided, that no such city or county has, within ten years previous to making such investment by any such savings bank or institution of this state, defaulted in the payment of any part of either principal or interest of any debt authorized by law of such state to be contracted; and provided further, that the total indebtedness of any such city or county is limited by law to ten per cent. of its assessed valuation.

In first mortgage bonds of any railroad company which ha⸴ paid dividends of not less than four per cent. per annum reᵧ⸱ larly on their entire capital stock, for a period of not less tʰ⸱⸱

five years next previous to the purchase of such bonds, or in any consolidated mortgage bonds of any such company authorized to be issued to retire the entire bonded debt of such company.

In real estate, strictly in accordance with the following provisions: (*a*) A plot whereon is erected, or may be erected, a building or buildings requisite for the convenient transaction of its business, and from portions of which, not required for its own use, a revenue may be derived; the cost of such building or buildings and lot shall in no case exceed fifty per cent. of the net surplus of such corporation.

They are expressly prohibited from investing in any bank stock.

The fact that trust companies, during the great increase in business and general prosperity of the country, have been successful for several years past, is no guarantee that such success will continue in the future. It is rather to be apprehended that younger and weaker companies will be tempted, by the great success that has attended some of the operations of the older and stronger companies, to attempt to reap over the same ground that has already been gleaned, and in their confidence that they also may succeed, and in their anxiety for success, may meet with disaster.

Be that as it may, that class of investment is quite outside those authorized by the Savings Bank act.

The forty-sixth section of the present Savings Bank act expressly prohibits any other banking institution from doing what is called a savings bank business; and I know of nothing in the national law authorizing the creation of national banks which saves them from being subject to the provisions of that act.

It is claimed by the defendants that trust companies are authorized, notwithstanding that act, to do a savings bank business; and they rely upon the eighteenth subdivision of the sixth section of the "Act concerning trust companies" [Revision of 1899]. (*P. L. of 1899 p. 455*), which is in this language:

"To receive money on deposit to be subject to check or to be repaid in such manner and on such terms, and with or without interest, as may be agreed upon by the depositor and the said trust company."

I am unable to construe that section as repealing by implication the forty-sixth section of the Savings Bank act, above referred to, approved April 21st, 1876 (*P. L. of 1876 p. 357*), and which declares

"that it shall not be lawful for any bank, banking association, firm, stock company, corporation or individual banker, to advertise or put forth a sign as a savings bank, either directly or indirectly, or in any way to solicit or receive deposits as a savings bank, except in the case of banks or deposit companies now authorized by law to receive deposits on interest, or banks incorporated under this act ;"

and then proceeds with the penalty—$100 a day for every day such offence shall be continued.

Now, the section in the Trust Company act, above cited, and relied upon by the defendants to justify them in seeking savings deposits, does no more than authorize a trust company to do just what every business man or institution has a right to do without it, namely, to borrow money from whom he pleases and at the best rate he can.

Besides, the words "savings institution" or "savings bank" have come to have a special meaning in the minds of small savers, as indicating an institution especially adapted for the use of that class, and giving them a peculiarly safe place of deposit for their savings of the character above described, and legislation concerning banks and trust companies ought not to be construed to include savings banks deposits except by the use of very clear language.

The truth is that the defendants' whole position and argument on this part of the case entirely overlooks the spirit and object of the savings banks system of this and other states of the union.

Its governing principle, as already stated, is that it assures safe security with small interest, with no profit to the managers, as contradistinguished from large interest and less safe security.

It is therefore quite improper to say that the class of persons I have mentioned were furnished by the national bank and the defendants' new trust company with a place of deposit for their money equally advantageous and secure as that of the defendant corporation.

In coming to this conclusion I mean no disparagement to the business of general banking as pursued by trust companies and other banking institutions. It is a perfectly legitimate business, but like all mercantile enterprises, however conservatively conducted, it has in it an element of speculation and hazard, and requires a talent for business management quite different from that required for a savings institution.

It does not affect this reasoning to say that the two classes of business are, to some degree, intermingled, and that many persons, other than the classes above attempted to be described, do take advantage of savings institutions. This cannot be entirely avoided; but it is well known that the managers of such institutions generally graduate their dividends, giving to the smaller depositors a larger rate of interest than to the larger, thereby discouraging the use of the institution by those who are not within the scope of its proper province, and the managers can, and do sometimes, decline deposits from persons who apparently do not need to use a savings institution.

Counsel for complainant contends, and I agree with him, that the circulars above set forth are distinct and direct solicitations by the defendants for the receipt of savings deposits; and I think it is a clear breach in spirit, if not in letter, of the restrictive clause of the Savings Bank act, above cited.

Again, it was asked if the managers of a savings institution are indisposed to further continue its maintenance, can they be compelled to continue it against their will? It must be confessed that there is no express provision in the charter of the Bloomfield Savings Institution or in the General Savings Bank act for the continuance of the life of a savings bank when the officers shall determine not further to continue it. However, I think there is no difficulty in perpetuating its existence if competent men can be found who are willing to undertake the task. The charter of the defendant corporation provides that the managers *may* fill any vacancies. But the sixteenth section of the General Savings Bank act (*P. L. of 1876 p. 346*) is, by the fifty-second section thereof, made applicable to savings banks already organized; and that section declares that

"all vacancies in such board, by death, resignation or otherwise, *shall* be filled by the board of managers, on approval by the state board, with persons duly qualified by section two of this act, as soon as practicable, at a regular meeting after such vacancies shall occur."

It was therefore clearly the duty of the defendants to fill any vacancies that might occur in the board of managers, and there was not the least difficulty in their doing so in accordance with their duty, provided they could find proper men willing to assume the burden; and, by a series of resignations and elections, they could have worked an entire change in the personnel of the board. There is no pretence that they attempted to do this.

They further ask what course they could pursue in order to meet the competition of the national bank; and the answer is, they could appeal to the law to prevent that bank from seeking savings deposits.

But it hardly lies in their mouth to claim that they were at all embarrassed by the competition of the national bank, when they themselves did not hesitate, before the national bank held out its advertisement, to start a trust company for the purpose of entering into a like competition with the savings institution, and without at the time, as they aver in their answer, having any intention of winding up that institution. So that they are in the position, on their theory, of not only not attempting to protect the savings institution against the competition of the national bank, but they are themselves chargeable with organizing an institution in direct and palpable competition with the savings institution.

It is asserted in the answer that shortly after the open advertisement in September by the national bank for savings bank deposits, namely, in October and November, 1902, there occurred a marked falling off in the deposits of the savings institution.

It is not shown how much of such alleged falling off was due to the competition of the national bank, and how much to that of the new trust company.

Be that as it may, I find, by the schedule inserted in the answer, that the increase in the deposits for the whole year of 1902 was $73,386.11, about $8,000 more than for the previous year, and more than for any previous year. And I further find

that the amount deposited in December, 1902, was $18,517.58, which was more than that of any previous December, except that of 1898; that it was nearly $7,000 more than in December, 1901. It seems to me that one of two inferences follow immediately from this showing: either that there was no such falling off of deposits as the defendants claim, or some persons obtained an inkling of the defendants' intention and made unusual deposits for the express purpose of sharing in the division of the surplus.

This review of the defence leads me to the conclusion that, so far as above considered, it cannot avail the defendants.

The remaining question is, has the complainant a standing in this court to maintain this action?.

It was urged by counsel that only the attorney-general, representing the state, has such standing.

I am entirely satisfied that he has such standing, and must presume that, if the matter had been brought to his attention and he had taken the same view of the law applicable thereto as I have taken, he would have acted.

There was nothing before me to indicate that it had been brought to his attention in such manner as to require him to act; nor did I think it necessary or expedient to require him to be brought into the case as a party representing the public.

But I am not ready to accede to the proposition that no individual has such right.

Complainant and her children are, and have been for many years, depositors in that institution. They are residents of Bloomfield and a part of that portion of the great public for whose benefit the institution was created and maintained. They are thus interested, both in their individual and representative characters, in the continuance of the institution, with all its beneficent results.

But it was urged that they are not injured, because they will receive back whatever money they originally deposited, with interest and a share of the surplus. But is it true that they are not injured in fact? Is it not supposable that they may prefer to have the institution continued and its surplus devoted to giving it stability and strength in a financial storm, and at all

times to contribute to the expenses of its management, rather than now to receive a share in their hands? And is not such the policy of the law? And if so, are they not entitled to be heard, both on their own account and that of other present and prospective depositors?

With regard to the division of the surplus.

There is, indeed, no known mode of dividing a surplus of a savings bank, when such division becomes necessary, except among the *bona fide* depositors at the time of the dissolution. *Morristown Savings Institution* v. *Roberts, 15 Stew. Eq. 496.*

But it does not follow that such division is just and equitable. It is a rule of convenience and necessity, not of equity.

Consider in that connection the temptation of eleventh-hour people to come in as depositors in anticipation of dissolution.

In fact, I am confirmed in the view I stated at the argument, that the attempt to make an equitable division of the surplus of a savings institution, such as we have to deal with here, presents an insoluble problem. That surplus is the result of the surplus earnings of all the money that has been deposited by all the depositors from the beginning of the bank. It is well known that many of those have already withdrawn, and thereby, as it has been well said, have abandoned their share in the surplus; but it by no means follows that the equitable rights of those who remain are any greater by such abandonment than they would have been without it. Then of those who remain at the end some have been depositors for a longer time than the others. The present case presents an example of that. In my opinion the true *status* of a surplus is that it is held by the institution in trust for the benefit of the immediate community in assisting to maintain and perpetuate the existence of the institution.

It is admitted, by the answer, that the complainant and her children have been depositors for many years, and her equity is much greater than the new depositors.

This institution is, as I have said, a public institution, created and promoted by the state for the benefit of such as may deposit therein. The deposits of the complainant and her children are not large, and it cannot be said that she is not one of those who come within the purview of the object of such institution. By

becoming a depositor she becomes peculiarly interested in the institution, and in its permanency and continuance, and that interest is over and above that of the public at large. She has a right to say that she prefers to have the institution continue, rather than to have it wound up and to take her share of the surplus, and, in my judgment, she has a right to say this, not only as a depositor, but as a citizen for whose benefit it was created.

The object of an accumulation of surplus is, as before remarked, to guard against loss to the depositors in those ever recurring, but seldom expected, financial revulsions, which, from time to time, sweep over the country and cause a temporary depreciation in the value of the best investments. The surplus also serves, by its earnings, to diminish the cost to the present depositors of the management of the institution.

The complainant, then, may well come to the conclusion that it is more to her pecuniary interest to have that institution continue as a custodian of her deposit than to receive back the amount of her deposit, with her share in the surplus.

It is plain that the natural disposition of many depositors in an institution of this kind, with a large surplus, would be to have the same wound up, provided they get a share of the surplus. Hence the larger the surplus, the more thoroughly established the institution, the greater the relative amount of its surplus to its deposits, the more anxious many of the depositors would be to have it wound up. And this peculiar situation tends to justify the conclusion at which I have arrived, that the legislature intended the managers in this case to act judicially and judiciously and disinterestedly for the good of the public in the exercise of the judgment confided in them by the act of 1902.

For these reasons I shall advise an order that the restraint be continued until the final hearing of the cause.